USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__2/6/2024___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
--------------------------------------------------------------X
MARIAN E. PARKER,                              :
                              Plaintiff,       :
            -against-                          :
                                               :
                                               :       21-CV-7196 (VEC)
ISRAEL DISCOUNT BANK OF NEW YORK,              :
INC.; JOHN DOES [1-10],                        :       OPINION AND ORDER
                                               :
                              Defendants.      :
--------------------------------------------------------------X
```

VALERIE CAPRONI, United States District Judge:

Plaintiff Marian Parker sued Israel Discount Bank of New York Inc. (the "Bank"), her

former employer, for discrimination, failure to accommodate, and retaliation in violation of the

Americans with Disability Act, 42 U.S.C. §§ 12101 et seq. ("ADA"), the New York State

Human Rights Law, N.Y. Exec. Law §§ 290 et seq. ("NYSHRL"), and the New York City

Human Rights Law, N.Y. City Admin. Code §§ 8-101 et seq. ("NYCHRL").[1]  Defendant moved

for summary judgment.  For the reasons discussed below, Defendant's motion is GRANTED.

## BACKGROUND

Parker worked at the Bank as Technology Risk Officer from December 3, 2018, to

February 4, 2019, Def. 56.1 ¶¶ 14, 18, 81,[2] and she was subject to a ninety-day probationary

period for new hires, see Markel Decl., Ex. F; Ex. D, 127:7–20.  She reported directly to Ahsan

Sheikh, the Chief Information Security Officer ("CISO"), and worked closely with two other

members of her team: Theodore Darko and Vipul Raval.  Def. 56.1 ¶¶ 7, 14, 140.

---

[1]      Parker confirms in her memorandum that she is not asserting a hostile work environment claim, nor is she
asserting claims against any John Does.  See Pl. Mem., Dkt. 76 at 1 n.1.

[2]      A comprehensive 56.1 Statement appears at Docket 82 and is cited as Def. 56.1.  All facts are undisputed
unless otherwise noted.

Parker was responsible for, among other items, "[a]ssisting the Office of the CISO in meeting regulatory . . . requirements across the technology landscape," "[e]nsur[ing] the implementation and continuous adaptation of the risk framework," and "[e]xecut[ing] independent oversight, analysis, validation, monitoring and reporting of risks and controls around the Bank's technology landscape." Markel Decl., Ex. A at 1–2. Specifically, she worked with Darko to update the Information Security Work Plan (the "Work Plan"), which provided a roadmap for the Bank's information security functions and included audit outcomes, security goals, and compliance requirements. Def. 56.1 ¶¶ 25, 27. She also worked with Darko to prepare presentations for the Bank's Information Security Steering Committee ("ISSC") meetings. Def. 56.1 ¶ 30. Sheikh's plan was to have Parker eventually take full responsibility for the Work Plan and presentations to the ISSC, but she worked with Darko on these tasks through her termination date. Goodell Decl., Ex. 5–6.

Parker's Initial Complaints About the Bank's Technology

When Parker joined the Bank, it had purchased but not fully implemented a Governance, Risk and Compliance platform ("GRC"). Def. 56.1 ¶¶ 34, 37. A GRC platform allows information to be centralized and shared across an organization, and it minimizes the amount of manual data entry needed for compliance reporting. Def. 56.1 ¶¶ 34, 40. Parker was familiar with GRC and had used this type of platform when she worked at larger financial institutions. Def. 56.1 ¶ 35.

Parker, as a contributor to security reporting for the Bank, believed that, if fully integrated, GRC could have reduced the amount of required manual data entry. Def. 56.1 ¶ 40. Just days after beginning her employment at the Bank, she scheduled a meeting with IT professionals to discuss further implementation of the GRC platform. Def. 56.1 ¶ 38. She

thought that, without GRC, the reports she and her colleagues needed to prepare were "very, very difficult and cumbersome to do in Excel and Access."  Markel Decl., Ex. C, 248:19–249:6.  Parker's colleagues testified that she repeatedly complained and expressed frustration about the lack of a GRC platform.  *See e.g.*, Markel Decl. Ex. G, 43:12–44:7; Ex. D, 142:20–25.  According to Darko, Plaintiff "complained about the manual process of [the Bank] any time she got a chance" and "whenever there was something to do, that is when she would talk about this stuff."  Markel Decl., Ex. G, 43:12–44:7, 44:24–45:14.  Sheikh said that Plaintiff's criticisms were causing morale problems at the Bank and called her a "problem-identifier," rather than a "problem-solver."  Markel Decl., Ex. D, 79:19–81:2, 142:20–25.

Parker's Injury and Request for Accommodation

About a month after she began her employment at the Bank, on the morning of January 10, 2019, Parker fell and injured the middle finger on her non-dominant left hand.  Markel Decl., Ex. C, 263:23–264:20.  She did not immediately see a doctor; she was able to continue to type emails and perform her job.  Markel Decl., Ex. X; Def. 56.1 ¶ 103.  That said, Parker reported her injury to Sheikh and reiterated a prior request for a headset so she could "talk and type in tandem;"[3] she received a headset shortly thereafter.  Markel Decl., Ex. C, 283:10–284:20; Ex. W.

A week later, on January 17, 2019, Plaintiff went to urgent care to have her finger examined.  Markel Decl. Ex. C, 268:3–17, 270:9–13.  The injury was diagnosed as a sprain; Plaintiff was given a finger splint and advised to take over-the-counter medication for pain.  Def. 56.1 ¶ 88.

---

[3]      Parker had initially requested a headset the day before she injured her finger, but she renewed her request after the injury.  *See* Markel Decl., Ex. W.  In her deposition, Parker admitted that even if she had not injured her finger, she would still have received the requested headset.  Markel Decl. Ex. C, 284:16–20.

On January 22, 2019, Parker directed Darko[4] to take meeting minutes on her behalf at a meeting scheduled for the following day. Markel Decl., Ex. Y. She explained that she was "still typing quite slow due to this left hand injury." *Id.* Darko took minutes at the January 23 meeting (it was typically Darko's responsibility to take the meeting minutes), and he sent them to Parker. *See* Markel Decl., Ex. G, 51:3–14; Ex. C, 259:2–12; Ex. Z.

On January 31, 2019, three weeks after her fall, Parker saw an orthopedist. *See* Markel Decl., Ex. AA. The orthopedist recommended Parker receive occupational therapy and "buddy tape" two of her fingers together. *Id.* at 2. With permission of the Bank, Parker attended her first occupational therapy appointment during working hours on Friday, February 1, 2019. Markel Decl., Ex. C, 305:9–306:11. The next business day, Monday, February 4, Parker asked Human Resources for a "medical accommodation form." *See* Markel Decl., Ex. BB.

Parker's Work Performance and Ultimate Termination

Beginning well before Parker was injured, Sheikh had concerns about her job performance. On December 28, 2018, Sheikh sent two emails to Parker about her responsibilities and his expectations. *See* Markel Decl., Ex. O. In the first, he sent her a document explaining her key job responsibilities. *See id.* at 1. In the second, he told Darko and Parker about his plan to transfer work from the former to the latter. *See id.* at 3–4. He reminded Parker that "[k]ey to the reporting is accuracy and completeness" and that he "expect[s] a zero error rate on this task." *See id.* He also told Parker that Work Plan reporting should be finalized, approved, and sent "to all key stake holders of ISSC at least one week prior to the ISSC meeting." *Id.* at 3. He testified that he sent these reminder emails because during Parker's first

---

[4]   Sheikh was presumably aware that Plaintiff had directed Darko to take minutes at the meeting because Parker copied Sheikh on the email. *See* Markel Decl., Ex. Y.

few weeks at the Bank she had failed to produce certain deliverables as required.  Markel Decl., Ex. D, 57:4–15.

Because of the volume of information on the January ISSC agenda, the meeting was split into two meetings: one scheduled for January 23, 2019, regarding issues other than the Work Plan, and a second scheduled for January 30, 2019, to discuss the Work Plan.  Markel Decl., Ex. P.  On January 22, 2019 — one day before the first ISSC meeting, eight days before the Work Plan meeting, and one day before the deadline to circulate the Work Plan materials — Sheikh asked Parker about missing deliverables.  *See* Markel Decl., Ex. Q.  Sheikh asked to see the meeting agenda for the January 23 meeting.  *Id.*  Instead of sending a draft, Parker asked whether a detailed agenda was needed, clearly implying that no agenda had yet been prepared.  *Id.*  Sheikh told her a detailed agenda was required and explained why; he reminded Parker that preparation of the agenda was her responsibility.  *Id.*  Sheikh also asked Parker if she had an update on the Work Plan.  *Id.*  Parker responded that she would complete data input that day; the record does not reflect whether she did, in fact, complete data entry for the Work Plan on January 22.  *Id.*

On January 28, 2019, five days after the Work Plan should have been distributed, Sheikh asked Parker to forward to him the draft Work Plan.  Markel Decl., Ex. R.  According to Sheikh, he made the request because it was overdue.  Markel Decl., Ex. D, 92:4–24.[5]  Sheikh rescheduled the Work Plan meeting to February 13, 2019; that gave the team more time to finalize the Work Plan.  *See* Markel Decl., Ex. P.

---

[5]      Parker quibbles with Defendant's assertion that Plaintiff had not produced the Work Plan by January 28. *See* Def. 56.1 ¶ 63.  Although she references an email in which she told Sheikh she would print the Work Plan for him, significantly she does not assert (or point to any evidence to demonstrate) that she had actually done so prior to January 28.  *Id*.

Parker's failure to produce the Work Plan on time prompted Sheikh to discuss concerns with Plaintiff's performance and behavior during her probationary period with Human Resources.  Markel Decl., Ex. D, 129:11–22.  On January 28, 2019 — before Parker asked for permission to schedule an occupational therapy appointment during work hours on February 1 and before she asked Human Resources for a formal accommodation form on February 4 — Sheikh spoke with Human Resources about terminating Plaintiff.  Markel Decl., Ex. D, 129:11–25.   Human Resources advised Sheikh to put his concerns in writing; Sheikh did so the following day.  Markel Decl., Ex. D, 130:3-10; Ex. M.  Sheikh's memo stated that he was not satisfied with Parker's (1) attitude and (2) her failure to complete assignments on time.  Markel Decl., Ex. M.

On January 31, Sheikh and Human Resources finalized the memorandum regarding the termination of Parker's probationary employment.  *See* Markel Decl., Ex. N.  The final draft, although edited for style and clarity, reflected the same two concerns that were reflected in the January 28 draft: Parker had a negative attitude toward the manual processes at the Bank and had failed to meet the deadline for the Work Plan.  *See id.*  Also on January 31, 2019, Sheikh told Human Resources that he would be in contact the following week to set "an actual separation date."  *Id.*

Parker eventually sent a draft Work Plan, riddled with mistakes, to Sheikh on February 1, 2019.[6]  *See* Markel Decl., Ex. T, Ex. D, 104:12-105:10; Goodell Decl., Ex. 35.  In the evening of

---

[6]      On January 30 and 31, 2019, Sheikh sent Parker additional information to be included in the Work Plan.  *See* Markel Decl., Ex. S.  He reminded her that he wanted to see the Work Plan on February 1.  *Id.*  On February 1, he sent Parker another email with the subject "IS Work Plan?" asking about the status of the document.  Markel Decl., Ex. H.  He reiterated his request that the document be provided to him that day before 3pm.  *Id.*  Parker committed to getting it to him before the end of the day.  *Id.*

Friday, February 1, 2019, Sheikh and Human Resources set Monday, February 4, 2019, as Parker's termination date.  *See* Markel Decl., Ex. U.

The Bank terminated Parker, as scheduled, on February 4 during a meeting with Parker, Sheikh, and a representative from Human Resources.  Markel Decl., Ex. C, 310:25–311:6.  Upon hearing the news, Plaintiff gestured for Sheikh to stop speaking, as she did not want to hear the reasons for her termination.  Def. 56.1 ¶ 82.

A month after she was fired by the Bank, Parker began working at Bank of China.  Def. 56.1 ¶ 115.  Her new role involved typing, and she did not seek any accommodations for her finger from her new employer.  Def. 56.1 ¶¶ 116-117.

## DISCUSSION

### I.   Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (internal quotation marks and citation omitted).

While the Court must construe the facts in the light most favorable to the non-moving party, "a party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  *Fed. Trade Comm'n v. Moses*, 913 F.3d 297, 305 (2d Cir. 2019) (internal quotation marks and citation omitted).  Accordingly, to defeat a motion for summary judgment, the nonmoving party must produce "specific facts showing that there is a genuine issue for trial."  *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006)

(citation omitted).  A "scintilla of evidence" is not enough.  *Fincher v. Depository Tr.*, 604 F.3d 712, 726 (2d Cir. 2010) (internal quotation marks and citation omitted); *see also D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998) (a party "must offer some hard evidence showing that [her] version of the events is not wholly fanciful"); *Baity v. Kralik*, 51 F. Supp. 3d 414, 417–18 (S.D.N.Y. 2014) (a party opposing summary judgment must "specifically respond to the assertion of each purported undisputed fact . . . and, if controverting any such fact, [must] support its position by citing to admissible evidence in the record").

Defendant moves for summary judgment on all of Plaintiff's claims, arguing that Plaintiff does not have a qualifying disability and, even if she did, she faced neither discrimination nor a failure to accommodate.  Finally, it argues that Plaintiff's termination was a result of contemporaneously documented work failures, not because of her putative disability or any request for accommodation.

## II.   Defendant is Entitled to Summary Judgment on Plaintiff's Discrimination and Failure-to-Accommodate Claims Under the ADA Because Plaintiff Did Not Have a Qualifying Disability

The ADA prevents covered employers from discriminating against an employee because the employee has a disability.  42 U.S.C § 12112(a) ("No covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . discharge of employees.").  The Court evaluates claims of discrimination and failure to accommodate under the ADA using the burden-shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013).  The first step of the *McDonnell* test requires the plaintiff to make out a *prima facie* case by showing that (1) the employer is subject to the ADA; (2) the plaintiff was disabled within the meaning of the ADA; (3) the plaintiff was qualified to perform the essential functions of her job with or without an accommodation; and (4) the plaintiff suffered an adverse employment action because of her

8

disability.  *Woolf v. Strada*, 949 F.3d 89, 93 (2d Cir. 2020).  Claims for failure to accommodate

require a showing that (1) the plaintiff has a disability, (2) the plaintiff's employer had notice of

the disability, (3) the employee could perform the essential functions of her job with reasonable

accommodation, and (4) the employer refused to make such accommodations.  *Tafolla v. Heilig*,

80 F.4th 111, 118 (2d Cir. 2023).

     The Bank argues that Parker was not disabled within the meaning of the ADA.  A person

is disabled if she has "a physical or mental impairment that substantially limits one or more

major life activities" or is regarded as having such an impairment.  42 U.S.C. § 12102(1); *see*

*also Hamilton v. Westchester Cnty.*, 3 F.4th 86, 92 (2d Cir. 2021).  Not every impairment or

illness is a qualifying disability under the ADA.  *Capobianco v. City of New York*, 422 F.3d 47,

56 (2d Cir. 2005); *see also Marecheau v. Equal Emp. Pracs. Comm'n*, No. 13-CV-2440 (VEC),

2014 WL 5026142, at *5–6 (S.D.N.Y. Sept. 30, 2014) (enzyme deficiency causing body odor

after consuming certain foods not a disability).  Instead, the impairment must (1) "limit a major

life activity," and (2) "the limitation must be substantial."  *Capobianco*, 422 F.3d at 56.

     Major life activities are those "that are of central importance to daily life," and include

"caring for oneself, performing manual tasks, . . . and working."  *Id.* (citing 29 C.F.R.

§ 1630.2(i)).  Parker has presented evidence that the injury to her finger limited her ability to

perform certain tasks.  *See* Markel Decl. Ex. Y (Parker directed Darko to take notes during a

meeting because she was "still typing quite slow due to this left hand injury"); Markel Decl. Ex.

BB (Parker asked human resources for a medical accommodation form because her injury "has

slowed down [her] typing a bit").

     The question then becomes whether limitations to the speed with which Parker could type

creates a question of fact whether she was disabled under the ADA.  The requirement that a

limitation be substantial is "not an exacting one." *Woolf*, 949 F.3d at 94.  Still, where the life activity at issue is working, the plaintiff must show that her condition substantially limited her from working in "a class or broad range of jobs"; showing merely the inability to perform a single, particular task is insufficient. *Id.* at 95.[7]

The evidence, viewed in the light most favorable to the Plaintiff, shows that her finger injury had, at most, a minimal impact on her ability to perform some tasks at work but did not substantially limit her ability to perform a class or broad range of jobs.  Plaintiff, who is right-handed, injured the middle finger on her left hand.  Def. 56.1 ¶¶ 84, 92.  Plaintiff did not seek medical attention until one week after the fall when she went to urgent care.  Def. 56.1 ¶ 87.  The medical providers at the urgent care facility took x-rays, which revealed no chips or broken bones.  Def. 56.1 ¶ 89.  They advised Parker to take over-the-counter pain medication.  Def. 56.1 ¶ 88.

Plaintiff admitted that after the injury she was able to type emails "using nine of her ten fingers" and that she "continued to type and do work despite her finger injury."  Def. 56.1 ¶ 103; *see also* Markel Decl. Ex. X (emails Plaintiff typed the day after she injured her finger). Although Plaintiff's finger injury "slowed down [her] typing a bit," Ex. BB, she was able to complete tasks assigned to her.  *See, e.g.*, Def. 56.1 ¶¶ 172, 192 (completing meeting agenda and draft Work Plan).  Plaintiff's own admission and the supporting evidence showing that she was able to complete assigned tasks after she was injured are fatal to her claim that the finger injury substantially limited the major life activity of working.

---

[7]      Defendant's argument that the temporary nature of Parker's disability makes it insubstantial is not persuasive.  *See Hamilton*, 3 F.4th at 94 ("[A] temporary injury can constitute a qualifying disability, as long as the requirements of the ADA are met.").  That said, not all temporary injuries qualify as disabilities under the ADA. *See id.* (acknowledging that just because an impairment lasting less than six months *can* constitute a disability does not mean such an impairment *will* constitute a disability).

The only task Parker claims she could not complete was taking notes during a meeting, but it is unclear whether taking those notes even fell within Parker's job responsibilities.  *See* Def. 56.1 ¶ 106 (notetaking was Darko's responsibility); Markel Decl., Ex. G, 51:3–14.  But viewing the evidence in the light most favorable to the nonmovant and assuming notetaking was Parker's responsibility, inability to perform such a specific task does not amount to a substantial limitation on her ability to perform a "class or broad range of jobs."  *Woolf*, 949 F.3d at 94.  This conclusion is further supported by the fact that Parker, after her termination from the Bank, worked at Bank of China, where her job required her to type, without needing any accommodations.  Def. 56.1 ¶¶ 115–117.

Parker relies on *Greenbaum v. New York City Transit Auth.*, No. 21-1777, 2022 WL 3347893 (2d Cir. Aug. 15, 2022), as authority for the proposition that the inability to type other than slowly is a substantial limitation on the major life activity of working.  *See* Pl. Mem. at 13.  But that case is inapposite.  In *Greenbaum*, the plaintiff submitted evidence that his tendonitis was so severe that, during a flare-up, he could not "do any typing or mouse-clicking."  *Greenbaum*, 2022 WL 3347893, at *2.  Further, his employer, having acknowledged that the condition substantially interfered with his ability to complete his job duties, placed him on leave and eventually changed his work status from "Restricted Work Temporary" to "Restricted Work Permanent."  *Id.*  In contrast, there is no evidence that Parker was ever unable to type or click a mouse.

Nor has Parker presented any evidence to create a question of fact whether the Bank regarded her as having such a substantial limitation.  Parker claims that "Sheikh evidently believed [the impairment] to be ongoing," Pl. Mem. at 15, but she provides no evidentiary support for that assertion.  Although she told Sheikh, Darko, and an employee in Human

11

Resources that her injury slowed her typing, *see* Markel Decl. Ex. W, Y (emailing Sheikh and Darko about her slowed typing); Markel Decl. Ex. BB (emailing HR about her slowed typing), she continued to work and prepared numerous typed documents and emails.  She was not (1) removed from projects involving typing, (2) placed on medical leave, or (3) noted as disabled in the Bank's system.  There is simply no evidence in the record that Sheikh specifically or the Bank more broadly regarded her as disabled simply because a finger injury slowed her typing.

Finally, Parker attempts to show that her finger injury substantially limited other major life activities: lifting and carrying items, opening doors, cooking, and doing dishes.  Pl. Mem. at 14 (citing Def. 56.1 ¶¶ 213–214).  She provides two pieces of evidence in support of this assertion.  First, she cites her orthopedist's March 28, 2019, visit summary which states, "[Parker] tells me that she has difficulty typing and performing some activities of daily living." Markel Decl., Ex. AA at 6.  It does not specify which "activities of daily living" were affected. *Id.*  Second, she cites her occupational therapist's March 28, 2019, visit summary which notes that Parker "still has pain and difficulty carrying groceries over 10 lbs."  Goodell Decl., Ex. 11 at 2.  While the injury to a finger on her non-dominant hand may have caused some discomfort and inconvenience, these medical records, viewed in her favor, do not create a question of fact whether Plaintiff's major life activities were substantially limited at or before the time her probationary employment was ended.

Because Parker has not raised a material question of fact whether her injury substantially limited her ability to work or perform other life activities, she cannot establish a prima facie case of discrimination or failure to accommodate under the ADA.  Accordingly, Defendant's motion for summary judgment on Plaintiff's claims of discrimination and failure to accommodate under the ADA is granted.

**III.    Defendant Is Entitled to Summary Judgment on Plaintiff's ADA and NYSHRL Retaliation Claims Because the Decision to Terminate Her Employment Was Made Prior to Her Request for Reasonable Accommodation**

Title IV of the ADA prohibits an employer from retaliating against an employee for engaging in ADA-protected activity.  42 U.S.C. § 12203.  To establish a *prima facie* case of retaliation under the ADA, the plaintiff must show that "(i) [she] was engaged in protected activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action."  *Tafolla*, 80 F.4th at 125.  On the causation element, the plaintiff must prove that but for the disability-related protected activity, the adverse action would not have been taken.  *Id.*  The NYSHRL similarly prohibits retaliation and is evaluated using the same standard.[8]  *See Benzinger v. Lukoil Pan Americas, LLC*, 447 F. Supp. 3d 99, 124–25 (S.D.N.Y. 2020) (listing the same four elements for NYSHRL retaliation and explaining that but-for causation is required to satisfy the fourth element).

The first three elements are not in dispute.  First, Parker's request for accommodation, regardless of whether she had a disability or was entitled to such accommodations, is a protected activity.  *Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 149 (2d Cir. 2002) (requesting accommodation is a protected activity under the ADA); *see also Daly v. Westchester Cnty. Bd. of Legislators*, No. 19-CV-04642 (PMH), 2021 WL 229672, at *8 (S.D.N.Y. Jan. 22, 2021) (same, even if not entitled to accommodation).  Second, the Bank knew about her protected activity because she made two requests — to attend physical therapy, *see* Markel

---

[8]     New York amended the NYSHRL in 2019 to render the standard for claims under that statute "closer to the standard of the NYCHRL."  *Livingston v. City of New York*, 563 F. Supp. 3d 201, 232 n.14 (S.D.N.Y. 2021).  That amendment applies to claims that accrued after October 11, 2019, and it does not apply retroactively.  *See id.*  Because Defendant's challenged conduct occurred before October 2019, the Court applies the standards of the pre-amended NYSHRL.

Decl., Ex. C, 305:24–306:11, and to obtain a medical accommodation form, *see* Markel Decl.,
Ex. BB — directly to the Bank.  And third, she was terminated.  Def 56.1 ¶ 81.

Plaintiff has not, however, proffered facts to create a triable issue as to whether her
request for accommodation was the cause of her termination.  Based on the evidence, no
reasonable jury could find a causal connection between the protected activity and the adverse
action because concerns about the quality of her work began before she was injured and the
decision to terminate her probationary employment was made before she engaged in any
protected activity.  Indeed, as early as December 28, 2018, about two weeks before the injury,
Sheikh reminded Parker of her job responsibilities because she had failed to produce certain
work product in a timely way.  Markel Decl., Ex. D, 57:4–15; *see also* Markel Decl., Ex. O
(reminder emails stating that Sheikh "expect[s] a zero error rate on this task").  On the morning
of January 22, 2019, after Parker had injured her finger but before she had requested any
accommodation, Sheikh asked Parker for the agenda for an upcoming meeting; her response
made it clear that she had not yet prepared the agenda.  *See* Markel Decl., Ex. Q.  On January 28,
2019, after Parker had directed Darko to take notes because of her slow typing but before she had
made any accommodation request,[9] Sheikh asked Parker for the Work Plan, which was days
overdue.  *See* Markel Decl., Ex. R; Markel Decl., Ex. D, 92:4–24.  That same day — again,
*before* Parker asked the Bank for permission to schedule an occupational therapy appointment
during working hours and before she asked Human Resources for a formal accommodation form
— Sheikh decided to terminate Plaintiff's employment.  Markel Decl., Ex. D, 129:11–14.

---

[9]     The email directing Darko to take notes at the meeting was not a "request" for accommodation.  *See Turner
v. Delta Airlines, Inc.*, 658 F. Supp. 3d 123, 137 (E.D.N.Y. 2023) ("Notably, to make a claim premised on a failure
to accommodate, a plaintiff must show that she did, in fact, request an accommodation.").  Parker told another
employee, who was neither her supervisor nor a Human Resources employee, to take notes at a meeting.  *See*
Markel Decl., Ex. Y.  She did not ask someone with power to do so to make changes to her work requirements
because of her injury.  *Cf. Tillman v. Verizon New York, Inc.*, 118 F. Supp. 3d 515, 540 (E.D.N.Y. 2015) (granting
summary judgment where plaintiff did not properly seek an accommodation).

Sheikh sent a draft termination memo to Human Resources on January 29, 2019, again before Plaintiff had requested any accommodation.  *See* Markel Decl., Ex. D, 130:3–10*,* Ex. M.  On February 1, 2019, the day Parker requested permission to attend an occupational therapy appointment during work hours, she produced a draft Work Plan riddled with errors.  *See* Markel Decl., Ex. D, 104:12–105:10; Goodell Decl., Ex. 35.  Following up on Sheikh's earlier decision to terminate Parker, the Bank set a termination date of February 4, 2019.  *See* Markel Decl., Ex. U.

On the morning of the planned termination, Parker asked Human Resources for a medical accommodation form.  *See* Markel Decl., Ex. BB.  Although she was terminated the same day she requested the accommodation form and one business day after seeking permission to attend a therapy appointment during working hours, such timing does not create a triable question of fact on causation because the undisputed evidence is that the decision had already been made to terminate her employment, *see* Markel Decl., Ex. U,[10] and it is beyond dispute that the Bank had concerns about her poor performance well before she requested any accommodation.  *See Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) (no inference of retaliation where "gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity"); *Heiden v. New York City Health & Hosps. Corp.*, No. 20-CV-10288 (LJL), 2023 WL 171888, at *24 (S.D.N.Y. Jan. 11, 2023) ("Were it otherwise, an employee concerned about the risk of an adverse action could forestall the action — and effectively hamstring his employer — with an artfully timed request for accommodation or complaint about

---

[10]     Plaintiff quarrels about when precisely the decision was made to terminate Plaintiff's employment.  See Def. 56.1 ¶ 238 (Plaintiff contends Defendant "made the decision" to fire Parker on January 31, 2019, which Defendant denies, asserting that was the date the termination memorandum was finalized).  Despite the quibble, both parties agree that the decision had been made by January 31, 2019, which was prior to her request for a medical accommodation form and her request for time off for a therapy appointment.

discrimination.").  The undisputed facts show that concerns about Parker's performance arose before she was injured and the decision to terminate her probationary employment had been made before she requested accommodation for her injury; accordingly, no reasonable juror could conclude that her request for accommodation was causally linked to her termination.

Parker's other attempts to create a genuine dispute of material fact fail.  First, she relies on the EEOC's finding of probable cause with respect to her claims.  *See* Goodell Decl., Ex. 38 (EEOC finding that there was no documentation that Parker "had a prior poor performance that warrants termination").  Where, as here, the EEOC's finding lacks legal or factual support, the Court need not consider it or weigh it so heavily as to require denying summary judgment.  *See Woodell v. United Way of Dutchess Cnty.*, 357 F. Supp. 2d 761, 772 n.15 (S.D.N.Y. 2005) (giving no weight to the EEOC determination because it was "sparse and conclusory" and "provide[d] no indication of what the EEOC's investigation actually involved"); *Nicholls v. Philips Semiconductor Mfg.*, 760 F. Supp. 2d 407, 420 n.11 (S.D.N.Y. 2011) (granting summary judgment for employer despite contrary EEOC finding); *Iverson v. Verizon Commc'ns*, No. 08-CV-8873 (SAS), 2009 WL 3334796, at *10, n.36 (S.D.N.Y. Oct. 13, 2009) (same).  Next, Parker cites to her own declaration opposing summary judgment, in which she states that Sheikh got "angry," treated her "harshly," and told her that she would never "survive" at the Bank after she requested accommodation.  *See* Parker Decl. ¶¶ 9, 12, 14.  These post-discovery statements are unsupported by any other evidence in the record, including Parker's own deposition, and, as such, should be given little weight.  *See Kalra v. HSBC Bank USA, N.A.*, 567 F. Supp. 2d 385, 397 (E.D.N.Y. 2008) (declining to credit the nonmoving parties' conclusory statements and personal beliefs); *Krow v. PineBridge Inv. Holdings U.S. LLC*, No. 19-CV-5711 (ER), 2022 WL 836916, at *10 (S.D.N.Y. Mar. 21, 2022) (declining to credit declaration, written over three

years after termination and contradicted by contemporaneous emails); *Kobrand Corp. v. Abadia Retuerta, S.A.*, No. 12-CV-154 (KBF), 2012 WL 5851139 (S.D.N.Y. Nov. 19, 2012) ("[S]elf-serving, conclusory affidavits, standing alone, are insufficient to create a triable issue of fact and defeat a motion for summary judgment."). Finally, Plaintiff argues that her termination was retaliatory because her colleague Darko, who shared responsibility for the Work Plan, was not fired for missing deadlines. But Darko is not an appropriate comparator because he was an experienced employee well outside of his probationary period. *See Gerzhgorin v. Selfhelp Cmty. Servs.,* No. 22-808, 2023 WL 2469824, at *2 (2d Cir. Mar. 13, 2023) (probationary employee is not similarly situated to non-probationary colleagues).

The best evidence Parker submitted to support even the possibility of a retaliatory intent is an email string among her, Sheikh, and Darko. On January 22, 2019, Plaintiff emailed Darko, with a copy to Sheikh, directing Darko to take notes at the January 23, 2019, meeting, explaining that she was typing slowly due to her injury.[11] Markel Decl., Ex. Y. A week later, on January 29, Plaintiff forwarded that same email to Sheikh, using her January 22 email to Darko as "proof" that she "was not to handle the console and open up [her] environment at last week's meeting." Goodell Decl., Ex. 25. She wrote in the email to Sheikh, "I can't due to my hand injury. [Darko] or yourself was supposed to do that." *Id.* Sheikh forwarded the January 29 email from Plaintiff to Human Resources asking to discuss when there was time. *Id.* Notably, that occurred roughly contemporaneously with Sheikh sending Human Resources the draft memorandum recommending her discharge. This lone email, read in the light most favorable to the Plaintiff, simply does not create a question of fact whether her demand, more than a week

---

[11]    Plaintiff's email to her colleague stated: "You will have to take the minutes [during the January 23 meeting]." Markel Decl., Ex. Y.

earlier that Darko take notes at the meeting, played any part in Sheikh's decision to end her employment.

But even if the evidence Parker has adduced were adequate to make out a *prima facie* case, the burden would then shift to the Bank to "articulate a legitimate, non-retaliatory reason for the challenged employment decision." *Whitney v. Montefiore Med. Ctr.*, No. 21-CV-9623 (PAE), 2023 WL 7386400, at *22 (S.D.N.Y. Nov. 8, 2023); *see also Benzinger*, 447 F. Supp. at 124–25 (the burden-shifting also applies to NYSHRL claims). Because the Bank has articulated a legitimate and non-retaliatory reason for terminating Parker, the burden would shift back to Plaintiff to create a question of fact whether the Bank's explanation is pretextual. *Id.* At that point, "the presumption of retaliation arising from the establishment of the prima facie case [would drop] from the picture." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013).

As noted, the Bank has provided non-retaliatory reasons for the termination. In the Bank's contemporaneous termination memo, Sheikh explained that Parker was terminated because of her poor attitude toward the lack of automation at the Bank and because she missed deadlines, both of which occurred while Parker was still in a probationary status. Parker has not presented any evidence that those reasons are pretextual.[12]

In an attempt to create a question of fact as to pretext, Parker argues that the draft memorandum and the final termination memorandum are inconsistent, but characterizing them as inconsistent does not make them inconsistent. *See* Markel Decl., Ex. M (first draft describing poor attitude and missed deadlines as reasons for termination); Markel Decl., Ex. N (final draft

---

[12]     Indeed, the email on which she relies to create an inference of causation confirms Sheikh's position that she had a bad attitude. *See* Goodell Decl., Ex. 25. While the context is not clear from the email string, the imperious nature of Plaintiff's explanation to her boss for her performance failure shines through. *See id.* ("[Darko] or yourself was supposed to do that.").

providing the same).  The termination memos and other documents created around the time of her termination, as well as the paper trail documenting Sheikh's concerns about the quality and timeliness of her work, support the Bank's rationale for terminating her employment.  *See Talbott-Serrano v. Iona Coll.*, No. 21-CV-1055 (CS), 2022 WL 3718346, at *10–11 (S.D.N.Y. Aug. 29, 2022) (holding that no reasonable jury could find pretext where contemporaneous communications reflect performance concerns with no mention of disability).  Parker insists throughout her brief that she was not a poor performer and did not miss deadlines.  *See* Pl. Mem. at 18–20.  But an employee's disagreement with an employer's assessment of performance does not stand, on its own, to create a question of fact whether the stated reason was pretextual. *Amley v. Sumitomo Mitsui Banking Corp.*, No. 19 CIV 3777 (CM), 2021 WL 4429784, at *17 (S.D.N.Y. Sept. 27, 2021).  And finally, even though the termination and the request for accommodation were close in time, temporal proximity alone is insufficient to defeat summary judgment at the pretext stage.  *Zann Kwan*, 737 F.3d at 847.

The evidence shows clearly that the Bank fired a probationary employee for having a negative attitude at work and for persistently missing deadlines over the course of her probationary period.  Given the evidence, and because no reasonable trier of fact could conclude that Plaintiff's protected activity was the but-for cause of her termination or that the Bank's stated reasons for termination were pretextual, Plaintiff's claims of retaliation under the ADA and the NYSHRL fail.

## IV.     Defendant is Entitled to Summary Judgment on Parker's NYCHRL Claim of Retaliation

In early 2019, when Parker's claims accrued, requesting an accommodation for a disability did not qualify as protected activity under NYCHRL.  See *D'Amico v. City of New York*, 73 N.Y.S.3d 540, 558–59 (1st Dep't 2018) ("Neither plaintiff's request for a reasonable

accommodation nor his filing of an internal workers' compensation claim constitutes protected activities for purposes of the . . . City HRL[]." (internal citation omitted)).  Although the NYCHRL was amended on November 11, 2019, to broaden the definition of protected activity to include requests for accommodation, the amendment does not apply retroactively.  *See Piligian v. Icahn Sch. of Med.*, 490 F. Supp. 3d 707, 724 (S.D.N.Y. 2020) (noting that the "amendment contains no retroactivity provision").  Accordingly, the Bank's motion for summary judgment is granted as to her claim of retaliation under the NYCHRL.

## V.   Defendant Is Entitled to Summary Judgment on Parker's NYSHRL Claim of Disability Discrimination

The four elements of a claim of disability discrimination under the NYSHRL are the same as the elements of an ADA claim: (1) the employer is subject to the NYSHRL; (2) the plaintiff was disabled within the meaning of the NYSHRL; (3) the plaintiff was qualified to perform the essential functions of her job with or without an accommodation; and (4) the plaintiff suffered an adverse employment action because of her disability.  *Piligian*, 490 F. Supp. 3d at 716–17.  That said, the NYSHRL defines disability more broadly than the ADA.  *Koonce v. Whole Foods Mkt. Grp., Inc.*, No. 22 CV 10418 (VB), 2023 WL 8355926, at *4 (S.D.N.Y. Dec. 1, 2023).  Under the NYSHRL, a disability is "a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques."  N.Y. Exec. Law § 292(21).  Although, as explained above, the injury to Parker's finger does not qualify as a disability under the ADA, the injury is a disability under state law because it is a physical impairment demonstrable by medically accepted clinical diagnostic techniques.  *See* Markel Decl., Ex. V at 3; Ex. AA at 2 (records showing that two medical professionals diagnosed Parker with a finger joint sprain).

That said, Parker has not created a triable question of fact as to whether she was discriminated against because of her disability because no reasonable factfinder could conclude that the injury was the but-for cause of her termination, *see Heiden*, 2023 WL 171888, at *22("[D]iscrimination claims under the ADA and NYSHRL both require but-for causation."), or that the Bank's stated reasons for her termination were pretextual.  As explained in further detail in Section III, Sheikh documented Parker's performance failures beginning on December 28, 2018 — about two weeks before she injured her finger — and continued to contemporaneously document her negative attitude and missed deadlines through the date even Plaintiff concedes he had decided to terminate her employment.  *See supra* note 10.

Viewing all of the evidence in the light most favorable to Plaintiff, there is no question of fact why her probationary employment was terminated: she had a bad attitude and failed to meet deadlines.  Because those factors are entirely disconnected from her injury, Defendant is entitled to summary judgment on her claim of discrimination under the NYSHRL.

## VI.   Defendant Is Entitled to Summary Judgment on Parker's NYSHRL and NYCHRL Claims of Failure to Accommodate Because the Bank Granted Every Requested Accommodation

Parker's claims for failure to accommodate under NYSHRL and NYCHRL fail as a matter of law because she has not provided any evidence that the Bank ever denied any requested accommodation.  The elements of a failure-to-accommodate claim under NYSHRL are: (1) the plaintiff is a person with a disability under NYSHRL; (2) an employer covered by the statute had notice of the disability; (3) the plaintiff could perform the essential functions of the job at issue with reasonable accommodation; and (4) the employer refused to make an accommodation.  *See Piligian*, 490 F. Supp. 3d at 717.  NYCHRL contains similar elements for this claim.[13]  *See*

---

[13]        The NYCHRL differs from the NYSHRL in some ways that are not relevant to Parker's claims.  For example, the city law does not require the employee to show that she can perform the essential requirements of the

*Romanello v. Intesa Sanpaolo, S.p.A.*, 998 N.E.2d 1050, 1053 (N.Y. 2013).  Parker satisfies the

first element under both laws because she has a qualifying disability under NYSHRL, *see*

Section IV *supra*, and under NYCHRL, which defines "disability" as "any physical, medical,

mental or psychological impairment."  N.Y. City Admin. Code § 8-102(16)(a).  The Bank does

not dispute the second or third elements.

Parker's claims fail, however, because she has provided no evidence to create a triable

question of fact whether the Bank failed to provide any requested accommodation.  The evidence

in the record shows that the Bank provided every accommodation for which she asked.  On

January 10, 2019, the day Parker injured her finger, she asked for a headset to help her talk and

type simultaneously, and she received one shortly thereafter.  Markel Decl., Ex. C, 283:10–

284:20; Ex. W.  On January 23, 2019, she ordered Darko to take meeting notes.  Markel Decl.

Exhibit Y (directing Darko to take notes).  Such a command to a non-supervisory colleague is

likely not a request for accommodations at all,[14] but even if it were, Darko took the notes and

sent them to Plaintiff after the meeting.   Markel Decl., Exhibit Z (Darko sending her the notes

from the meeting).  She asked the Bank for permission to attend an occupational therapy

appointment during work hours on February 1, 2019, and the Bank approved the request.  Markel

Decl., Ex. C, 305:9–17, 305:24–306:11.  Parker cannot salvage her claim by arguing that the

Bank failed to engage in an interactive process.  There was no need to engage in further process

where the Bank timely granted every request she made.  *See Noll v. Int'l Bus. Machs. Corp.*, 787

---

job with accommodation and instead makes that element an affirmative defense to be proved by the employer.  *See Romanello*, 998 N.E.2d at 1053.

[14]      *Cf. Tillman*, 118 F. Supp. 3d at 540 (granting summary judgment where plaintiff did not properly seek an accommodation).

F.3d 89, 98 (2d Cir. 2015) ("[T]he interactive process is not required when the end it is designed to serve—reasonable accommodation—has already been achieved.").

Because no reasonable jury could conclude that the Bank failed to provide reasonable accommodation, Defendant's motion for summary judgment on Plaintiff's claims of failure to accommodate under the NYSHRL and NYCHRL is granted.

## VII.   Defendant Is Entitled to Summary Judgment on Parker's NYCHRL Claim of Discrimination

The NYCHRL "creates a lower threshold for actionable conduct and must be construed liberally in favor of discrimination plaintiffs." *Cain v. Esthetique*, 182 F. Supp. 3d 54, 71 (S.D.N.Y. 2016), *aff'd*, 733 F. App'x 8 (2d Cir. 2018).  For this claim, the standard does not require but-for causation; instead, plaintiffs need only show that their disability played *some* role in their termination.  *See Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 & n.8 (2d Cir. 2013) ("[T]he plaintiff need only show that her employer treated her less well, at least in part for a discriminatory reason.").  An employer is entitled to summary judgment "only if the record establishes as a matter of law that 'discrimination play[ed] *no* role' in its actions." *Id.* (emphasis in original) (citing *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 38, 40 n. 27 (1st Dep't 2009)).

Even applying this lower standard, no reasonable jury could conclude that Parker's termination — which occurred during her probationary period and followed demonstrable and contemporaneously-documented performance failures — was motivated even in part by discrimination.  As described above in Section III, Parker's best evidence is an email, in which Parker told Darko to take notes at a meeting, that Sheikh forwarded to Human Resources. Goodell Decl., Ex. 25.  In the email chain, Parker sent Sheikh "proof" that she could not perform certain tasks because of her "hand injury." *Id.*  Sheikh forwarded the email to Human Resources,

writing: "[l]et's discuss this when you get a chance," about two hours before sending his memo recommending Parker's termination. *See id.*; *see also* Markel Decl., Ex. M.  The email, viewed in context with the rest of the record and in the light most favorable to the Plaintiff, still does not create a triable issue of fact as to whether her disability played some role in her termination.  The email includes neither explicit statements nor implicit suggestions that Sheikh considered Parker's finger injury in his decision to terminate her.  All it evinces is that Sheikh wanted to discuss Parker's imperious email with Human Resources, which is not discriminatory.

Because all of the evidence in this case shows that the Bank fired a probationary employee for repeated performance failures, no reasonable jury could conclude otherwise.

## CONCLUSION

For the foregoing reason, Defendants' motion for summary judgment is GRANTED in full.  The Clerk of Court is respectfully directed to terminate docket entry 68 and to close the case.

**SO ORDERED.**

Date:  February 6, 2024
     New York, New York

                  **VALERIE CAPRONI**
                  **United States District Judge**